# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

**ANTHONY LEGION**

|  |  |
|---|---|
| Petitioner | Civil Action No. 05-40181 |
| -vs- | Honorable Steven Whalen<br>United States Magistrate Judge |
| **KENNETH T. MCKEE** | Honorable Stephen J. Murphy III<br>United States District Judge |
| Respondent. | |

_____/

## MEMORANDUM OF LAW IN SUPPORT OF AMENDED PETITION

**STATE APPELLATE DEFENDER OFFICE**

**BY:**  s/Katherine Marcuz
     **KATHERINE MARCUZ**
     Assistant Defender
     3300 Penobscot Building
     645 Griswold
     Detroit, Michigan  48226
     (313) 256-9833
     kmarcuz@sado.org
     P76625

## <u>STATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

A jury convicted Mr. Legion and co-defendant Marvin Cotton of first-degree murder, M.C.L. § 750.316, and possession of a firearm in the course of a felony, M.C.L. § 750.227b, before the Honorable Daniel P. Ryan, Wayne County Circuit Court. On November 14, 2001, Judge Ryan sentenced Mr. Legion to life in prison, with a consecutive two-year sentence for felony firearm. The prosecution severed and dismissed the case against a third defendant, Devonte Parks.

The charges stemmed from the murder of Jamond McIntyre in the early morning of January 24, 2001. The prosecution introduced no physical evidence of Mr. Legion's guilt, and there were no witnesses to the actual shooting. The evidence connecting Mr. Legion to the murder consisted of the uncertain and contradicted eyewitness identification testimony of Kenneth Lockhart, the decedent's housemate, and Mr. Cotton's confession to a jailhouse informant. Mr. Lockhart testified that he was awoken by shots, and subsequently saw three men in the house. He identified Mr. Cotton, Mr. Legion, and Mr. Parks as those three men from a single array of photographs on February 15, 2001. *T2*,[1] 78-79. He identified Mr. Legion with a certainty of only ninety percent. *T2*, 78.

The prosecution presented many other witnesses who were at or near the scene of the crime. They, however, were unable to identify any perpetrators. Mr.

---

[1] "*T1*," "*T2*," "*T3*," and "*T4*" refer respectively to the four volumes of the trial transcript, held from October 15, 2001 – October 18, 2001.

Lockhart's girlfriend, Renay Tate, hid in a closet when she heard the shots, *T3*, 73. Kirk Washington, who was across the street, said he could only see two men shooting towards the victim's house, *T2*, 235-37.  Danyell Ashford the decedent's sister and Lovely Kimble, a friend of the decedent saw three men at his house shortly before the shooting.  *T2*, 253-254, *T4* 6-7.  Santonion Adams, an off-duty police officer who was at the house, also saw two individuals but could not identify them.  *T2*, 197.  These witnesses and the police officers who arrived at the scene of the shooting provided descriptions at odds with Mr. Lockhart's account of events.

Mr. Lockhart testified that on the night of the shooting, he unlocked the front door and returned to his room after the decedent called to say he had forgotten his keys.  *T2*, 44.  Later, after hearing shots outside the house, he crossed the hall and retrieved a gun from the master bedroom.  *T2*, 56.  He did not know whose gun it was, but knew to look for it, as "we usually have a gun in the house."  *T2*, 123.  He then returned to his bedroom, leaving the door open a crack.

Through the crack, he was later able to observe two men in the house, one of whom was armed.  *T2*, 60-61.  Mr. Lockhart identified Mr. Legion as one of the two men he saw in the kitchen but he could not specify which man had the gun. *T2*, 61-63, 69.  Marvin Cotton entered the house a few minutes later and joined the other two men.  *T2*, 64-66.  Mr. Lockhart asked the men the location of Jamond McIntyre, to which Mr. Cotton replied "he straight," and then commanded the

other two men to "kill him." *T2*, 71-72, 142. Mr. Lockhart fired once in response. *T2*, 72. His gun then jammed, and he retreated into the bedroom, where he remained until the police arrived. *T2*, 72-73.

Mr. Lockhart described the perpetrators as bald men with goatees at the time of the shooting. *T2*, 96, 108. Two other witnesses provided different descriptions. One observed the three men with hats and skull caps covering their heads. *T2*, 256-257. A second saw at least one man with a black skull cap. *T4*, 8. This same witness noted that one of the men was clean shaven. *T4*, 9.

At 1:55 AM on the morning of the shooting, Danyell Ashford the decedent's sister arrived at his house to borrow money from him. *T2*, 253-254. At his house, she saw three males standing on the porch. *T2*, 254. The decedent let her and the three males into the house. *T2*, 254. After borrowing money, Ms. Ashford left the house, without getting a good look at the three males. *T2*, 255. However, she did note that all three men had hats and skull caps on. *T2*, 256-257.

Lovely Kimble, a friend of the decedent, was also at his house on the night and early morning of the shooting. *T4*, 6-7. She noted three males there, at least one with a black skull cap, and one clean shaven. *T4*, 8-9. In court, Ms. Kimble identified Mr. Cotton as present at the scene. *T4*, 13. She never identified Mr. Legion. Ms. Kimble also identified a car at the scene as a gray-green Chrysler convertible. *T4*, 14.

Police who arrived on the scene found that Mr. Lockhart's account of events lacked credibility.  Lockhart admitted testifying at a prior hearing that the police "didn't really take a statement from me.  They threw me in there and said I'm a lie, I'm a crock of shit."  *T2 148*.  Police Officer Donald Rem, an evidence technician concluded that contrary to Mr. Lockhart's assertion, no guns were fired inside the house.  *T3 36*.  Sergeant Carl Frederick, who had twenty-five years of experience with homicides, believed that Lockhart had been drinking.  *T4 16, 19-20*.  He interviewed Mr. Lockhart and concluded that "he changed his story several times in talking to him, and what he said we couldn't substantiate by the physical evidence."  *T4 19*.

Police did find three guns in the house when they arrived on the scene, one in the closet, one at the head of a bed, and one under a bed.  *T3, 38-39*.  In a report, Sergeant Carl Frederick described the house as a "dope house," and the deceased as a "dope man."  *T2, 22*.

Mr. Lockhart attended a lineup on February 15, 2001, where photographs of Mr. Cotton, Mr. Legion, and Mr. Parks were place in a postcard array.  *T2, 78-79, 105*.  Mr. Lockhart immediately identified Mr. Cotton's photograph as one of the three men in the house.  *T2 103*.  He then said that photograph number two and photograph number seven, Mr. Legion and Mr. Parks respectively, "looks like the one I shot at."  *T2 103-104*.  Mr. Lockhart was uncertain about the exact location

of Mr. Legion and Mr. Parks in his house. *T2*, 79, 106. According to Mr. Lockhart, this confusion about their locations accounted for question marks next to their photographs. T2, 79. Mr. Lockhart attributed his uncertainty over identification to the fact that "probably was maybe one light on in the house or so, so I wasn't really sure of which one was where." *T2*, 79.

Mr. Lockhart testified at trial that he was 100% certain of his identification of Mr. Cotton, and 90% sure that Mr. Legion was one of the men in the house after the shooting: "Once I seen that photograph [at the lineup] and the incident from that night, it was just a trigger and I would say that – I'd say about 90% sure that this is the gentleman." *T2*, 77-78.

When Mr. Lockhart saw Mr. Cotton at the house, he realized all three men had been at the house the previous day. *T2*, 71. Mr. Lockhart's testimony showed a substantial basis for his identification of Mr. Cotton. He knew and "trusted" him, having seen him with the decedent on multiple occasions, *T2*, 66. He recognized him the night of murder, *T2*, 66, identified him to the police by name as "Marvin or Melvin," *T2*, 112, and unequivocally identified him both at the photo lineup and in court. *T2*, 64, 78.

In contrast, Mr. Lockhart only identified Mr. Legion and Mr. Parks as looking like the man he shot his gun towards. Furthermore, he was only 90% sure of Mr. Legion's identity when presented a photograph. *T2* 103-104, 77-78.

The prosecution also presented Santonion Adams, the decedent's cousin and a Detroit police officer. Officer Adams often went to his cousin's house to play pool and use the play-station. *T2*, 158. On the night of the shooting, Officer Adams went to the decedent's house to borrow his van. *T2*, 163. Officer Adams wanted the van to "visit a female" sometime after 1:00 AM, when he got off work. *T2* 163. After getting the van, Adams returned to the house at around 2:00 A.M., intending to give the deceased a ride in the borrowed car. *T2*, 164-166.

Adams spoke with the decedent on his cell phone as he was approaching the house. *T2* 166. He was waiting in the van in the driveway when he first heard the decedent call his name and then heard gunshots. *T2*, 168. He saw two men firing guns on the front porch, but was unable to determine in which direction the men were aiming. *T2*, 168-69. Adams testified that he ducked down into the van. He was unable to disentangle his service revolver from his sweater, but found a "small Glock" on the floor of the deceased's van. *T2*, 172, 176. He fired a shot from the Glock through the driver-side window and continued shooting several shots. *T2*, 176-77. Adams then crawled between the front seats, left the van, and fled across a vacant lot behind the decedent's house, *T2*, 179. The police never found the "small Glock", *T2*, 204, but one officer noticed that four bullets were missing from the clip of Adams' service revolver. *T2*, 224. Because of Officer Adams

involvement in the shooting, a union representative was summoned to the scene. *T4*, 37.

Officer Adams made no statement to officers responding at the scene, did not give a description of the perpetrators, and was unable to identify either defendant as the shooters. *T2*, 197. Like Ms. Kimble, Adams identified a Sebring convertible at the scene. *T2*, 166.

Kirk Washington testified that he lives across the street from the decedent's house and that upon hearing shots, he looked out his window and saw two men firing towards the decedent's house. He then saw the men throw their guns onto the roof of a nearby building and get into a gray convertible Chrysler. *T2*, 235-7.

Andre Paul, a friend of Mr. Legion and Mr. Cotton testified that Mr. Cotton's mother owns a green, convertible Chrysler Sebring. *T3*, 129. He identified the same photograph of the Sebring as Ms. Kimble. *T3*, 129-131; *T4*, 14. Mr. Paul explained that he introduced Mr. Cotton to the deceased and that three weeks prior to the shooting, he and Mr. Cotton went to the deceased's house. *T3* 128-30. In contrast, Mr. Paul never went to the to the deceased's house with Mr. Legion. *T3*, 131.

**Jailhouse Informant**

Aside from Mr. Lockhart's uncertain identification, the only other evidence against Mr. Legion was the account of Ellis Frazier, or "Old School," an inmate who testified that he and Mr. Cotton were both "dressing out" for court appearances on June 28, 2001. *T3*, 68. The two were in separate but adjacent holding cells, each containing 30-40 inmates and separated by a brick wall. *T3*, 113. The two never made eye-to-eye contact. *T3*, 72.

Frazier maintained that Cotton asked his advice on his case and confessed to him; stopping short of telling him who actually shot McIntyre, and intimated that he had a "hit" out on Lockhart. *T3*, 81. According to Frazier, Cotton told him that he and two other men went to the deceased's house, where he had been the day before, shooting pool. *T3*, 77. Cotton admitted that shots were fired, and a guy who tried to run was killed. T3 77-78. Cotton said that the police knew he had been at the scene of the crime because witnesses observed a Green Sebring, his mother's car. *T3*, 74. Cotton told him that an "Anthony" accompanied him during the shooting. *T3*, 84. According to Cotton, Anthony was downstairs, helping him get money from the safe in the deceased's house. *T3*, 84.

Frazier also repeatedly referred to a third participant in the holding cell conversation between him and Cotton named "Anthony." *T3*, 110. He testified that he thought the person sitting next to him in his cell was "Anthony," that

"Anthony" discussed the crime with Cotton, and that Cotton referred to Anthony as being "innocent." *T3,* 111. At trial, Frazier identified a picture marked "Number 7" [Exhibit no. 15] from Mr. Lockhart's original photographic lineup [Exhibit no. 14] as the person sitting next to him and whom the thought was named Anthony. *T3,* 111-117. "Number 7" was a photograph of Devonte Parks. *T2*, 102-106; *T4* 157. Frazier also stated that there was no other person in the cell with Cotton during the alleged conversation. *T3*, 119, 121.

In sum, Frazier described a conversation where Cotton confessed to his involvement in the shooting, along with an accomplice named Anthony. *T3* 77-78, 84. However, the person next to Frazier during this conversation was not Anthony Legion, but Devonte Parks, whom Cotton referred to as innocent. *T3*, 111; *T4* 157.

Frazier informed the prosecutor's office of what he had heard in a letter written on June 29, and in a statement dated October 5, 2001. *T3*, 123. He admitted that he and Cotton were unable to see each other at any time during their conversation, and that he made an identification based on seeing him walk past the cell at a later point. *T3*, 72.

**Trial**

Defense counsel moved *in limine* to suppress Frazier's statement as to Mr. Legion, or in the alternative to allow separate juries, arguing that the statement was a "powerfully incriminating unredacted statement by a non-testifying co-

defendant," which denied Mr. Legion his right to confront the witness. *T1*, 10. The court denied the motion on the basis that the statement was reliable. *T1*, 21. Defense counsel renewed his objection to Frazier's account of Cotton's statement about Mr. Legion after the testimony. *T3*, 147-50.

On the second day of the four-day trial, trial counsel informed the court that he had seen an unsigned dismissal form regarding the Devonte Parks case in the file. *T2*, 6. He asked the court why Mr. Parks' case was severed without notice to him, though all three defendants had been listed on the same Information. *T2*, 11. Because Lockhart's testimony provided the only link between Mr. Legion and the murder, counsel expressed concern that they would be unable to use the fact of Mr. Parks' dismissal to impeach Lockhart's credibility. *T2*, 14. The prosecution responded that dismissal of Mr. Parks' case did not necessarily reflect any tendency on the part of the prosecutor to disbelieve Mr. Lockhart. *T2*, 12-13.

**Direct Appeal**

Following his sentence, Mr. Legion filed a motion for a new trial based on insufficiency of evidence, or in the alternative, a new trial based on ineffective assistance of counsel. He also requested a hearing to create a record of testimony of two witnesses, Devonte Parks and an expert in eyewitness testimony, whom trial counsel failed to call. The trial court denied Mr. Legion's motion.

Mr. Legion subsequently filed a motion for reconsideration of the denial of his motion for a new trial. The Court held oral arguments on December 6, 2002, wherein Devonte Parks' affidavit was admitted as part of the record. *MT* 4. The affidavit states that Mr. Parks "did not introduce Frazier or anyone else to Cotton and can attest that there was no conversation about the McIntyre case between Cotton and anyone else in the bullpen in [his] presence." *Parks' Affidavit*, attached as Appendix F, ¶4.

In the affidavit Mr. Parks also states that he "passed a police polygraph which addressed the issue of whether [he] was at the McIntyre home on January 24, 2001 as alleged by Witness Lockhart, and whether [he] had participated in any manner in the shooting death of Jamond McIntyre". Appendix F, ¶8. Mr. Parks "was never contacted by Mr. Legion's attorney regarding whether [he] would be willing to testify on behalf of the defense in this matter" and he would have testified if he had been contacted. Appendix F, ¶¶9-10.

At the December 6, 2002, hearing, the trial judge denied the defendant's motion for post-trial relief, finding that the affidavit of Devonte Parks did not constitute new evidence that would serve as a basis for a new trial. Further, he said the evidence would go to weight, not credibility, where the credibility of Kenneth Lockhart was the deciding factor in the case. *MT*, 4, 7-9.

On October 14, 2003, in an unpublished per curiam opinion, the Michigan Court of Appeals affirmed Mr. Legion's convictions.  Appendix A.  The Michigan Supreme Court denied Mr. Legion's delayed application for leave to appeal on June 10, 2004.  Appendix B.

**Federal Habeas**

On June 7, 2005, Anthony Legion filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On July 10, 2007, this court issued an order granting Petitioner a conditional writ of habeas corpus based on the Sixth Amendment right to confrontation.  The order focused on the non-testifying co-defendant's unreliable confession to a jailhouse informant.  This court found that:

> Looking at the totality of the circumstances, the state appellate court should have had serious concerns with the reliability of Cotton's "jailhouse confession."  The alleged conversation between Frazier and Cotton took place in adjacent holding cells, which were separated by a brick wall, each cell holding about thirty to forty inmates.  Frazier and Cotton allegedly spoke through a little gap in the wall.  Neither was able to see each other at any time during their alleged conversation.  Frazier claimed to make an identification based on seeing Cotton walk past the cell at a later point.  In such a public forum of criminal defendants, Cotton would have had any number of motivations for a confession which implicated Petitioner.

(Opinion and Order, 25-26).     The district court did not review Mr. Legion's other claim regarding ineffective assistance of counsel for failing to call Devonte Parks as a witness.  By granting habeas relief on the Confrontation Clause claim,

the court considered it unnecessary to review the second claim.  (Opinion and Order 31-32).

On December 15, 2008, the United States Court of Appeals for the Sixth Circuit reversed and remanded *Legion v. McKee* to the district court for further proceedings.  *Legion v. McKee*, 303 F. App'x 297 (6th Cir. 2008).  The Sixth Circuit ruled that "[t]he issue raised in this habeas appeal has been conclusively decided by another panel of this court.  See *Desai v. Booker*, 538 F.3d 424 (6th Cir. 2008).  The Opinion and Order of the district court must be, and is, REVERSED on the basis of the Desai decision."  *Id.*

In *Desai*, the Sixth Circuit reversed the grant of a writ of habeas corpus because a change in Supreme Court law meant that the non-testimonial statement at issue no longer implicated the Confrontation Clause.  In ruling, the *Desai* court acknowledged that petitioner "raised the argument that the introduction of Adams' non-testimonial hearsay statement violates due process, a theory he has yet to exhaust in state court …. The district court may wish to give him an opportunity to exhaust that claim in the state courts now."  *Desai*, 538 F.3d at 431.

In his supplemental brief after remand, Petitioner contended that, unlike the petitioner in *Desai*, he had already exhausted the due process claim in state court even though the Michigan Court of Appeals resolved the issue as purely a Confrontation Clause challenge, and he and requested that this court grant habeas

2:15-cv-11463-GAD-DRG   Doc # 1   Filed 04/22/15   Pg 15 of 36   Pg ID 15

relief based on this claim.  On March 25, 2012, this court held that Mr. Legion's

due process claim was not properly exhausted in the state courts and it granted a

stay so that Mr. Legion could return to the state court to exhaust his due process

claim.

Accordingly, on November 12, 2012, Mr. Legion, through counsel, filed a

motion for relief from judgment on the due process claim.  Mr. Legion

subsequently supplemented with *pro per* issues.  On May 8, 2013, the trial court

denied the motion for relief from judgment.  *People v. Legion*, No. 01-003175-02-

FC (Wayne Cnty. Cir. Ct. May 8, 2013), attached as Appendix C.  Mr. Legion

moved for leave to appeal, and on March 17, 2014, the Court of Appeals denied

the application.  Appendix D.  The Michigan Supreme Court issued an order

denying Mr. Legion's timely application for leave to appeal on December 23,

2014.  Appendix E.

On January 15, 2015, this court lifted the stay and adjourned the filing date

for Mr. Legion's amended petition to April 22, 2015.

Mr. Legion is imprisoned at Muskegon Correctional Facility and petitions

this court for a writ of habeas corpus.

- 14 -

I. **THE ADMISSION OF CO-DEFENDANT'S UNRELIABLE STATEMENT TO A JAILHOUSE INFORMANT RENDERED MR. LEGION'S TRIAL SO FUNDAMENTALLY UNFAIR THAT IT DEPRIVED HIM OF HIS CONSTITUTIONAL DUE PROCESS RIGHTS TO A FAIR TRIAL. THIS COURT SHOULD GRANT THE PETITION FOR WRIT OF HABEAS CORPUS.**

An unreliable jailhouse informant presented the critical evidence of Cotton's confession, and Mr. Legion lacked the ability to cross-examine Cotton. As found by this court, this unreliable evidence directly resulted in Mr. Legion's murder conviction. Since the Supreme Court has found that fundamentally unfair testimony, unchallenged by cross-examination, violates constitutional due process, this court should grant habeas under *de novo* review.

**A. This court should excuse Mr. Legion's procedural default because there is cause for the default and prejudice.**

Ordinarily, a federal court will not review a habeas claim that was defaulted in state court "pursuant to an independent and adequate state procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If, however, there is "cause for the default and actual prejudice as a result of the alleged violation of federal law," then the federal court must excuse the default and entertain the claim. *Id.* In the present case, the state trial court found that Mr. Legion had defaulted on his claim that the admission of unreliable hearsay testimony violated his right to due process. *People v. Legion*, No. 01-003175-02-FC, slip op. at *7 (Wayne Cnty. Cir.

- 15 -

Ct. May 8, 2013), *leave to appeal denied*, No. 318976 (Mich. Ct. App. Mar. 17, 2014), *leave to appeal denied*, No. 149241 (Mich. Dec. 23, 2014). This court should excuse the default because Mr. Legion can show cause and prejudice. There is cause for the default because, at the time of Mr. Legion's trial, the admission of unreliable hearsay was typically reviewed under the Confrontation Clause. *See Ohio v. Roberts*, 448 U.S. 56 (1980). A separate challenge, brought under the more general Due Process Clause, would have been duplicative and would simply have been analyzed under the same *Roberts* rubric. Thus, there was no reason to bring the due process challenge at the time. *Desai v. Booker*, 538 F.3d 424, 431 (6th Cir. 2008) ("Desai had no reason to raise [a due process] claim at his criminal trial or in the Michigan court of appeals in view of the existing *Roberts* doctrine"). Moreover, the admission of the unreliable hearsay resulted in actual prejudice to Mr. Legion. As previously found by this court, the hearsay testimony was completely unreliable, and without it, there was minimal evidence connecting Mr. Legion to the crime.

The Supreme Court has held that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Reed v. Ross*, 468 U.S. 1, 16 (1984). The Court has also held that "the futility of presenting an objection to the state courts cannot alone constitute cause for a

- 16 -

failure to object at trial." *Engle v. Isaac*, 456 U.S. 107, 130 (1982). Mr. Legion's situation does not fit neatly within either of these two holdings: Mr. Legion's claim is not "novel," because there has long been a body of Supreme Court and lower-court jurisprudence holding that evidence may be so unreliable as to violate due process. But Mr. Legion's counsel also did not fail to raise the claim due to concerns about "futility." Rather, at the time of Mr. Legion's trial, the Confrontation Clause had completely displaced the Due Process Clause as the touchstone for constitutional challenges to unreliable hearsay testimony. The due process cases still existed and were still good law, but any challenge brought under them would necessarily have been duplicative and would essentially have been evaluated under the same *Roberts* rubric. *Cf. Graham v. Connor*, 490 U.S. 386, 395 (1989) (noting that when a constitutional amendment "provides an explicit textual source of constitutional protection," a claim should be brought under that amendment, rather than due process). Thus, at the time Mr. Legion did exactly what he was supposed to: He channeled his reliability challenge through the Confrontation Clause, and he had no reason to raise the Due Process Clause challenge. Therefore, he has cause to excuse the default.

The key motivation behind the procedural default doctrine is that state courts should not be "deprived . . . of an opportunity to address [constitutional] claims in the first instance." *Coleman*, 502 U.S. at 732. In Mr. Legion's case, the state court

- 17 -

effectively *did* have an opportunity to address the constitutional claim. In the trial court and on direct appeal, Mr. Legion did challenge the reliability of the hearsay testimony admitted against him. *See People v. Cotton*, No. 238216, 2003 WL 22339219, at *4-*5 (Mich. Ct. App. Oct. 14, 2003). The challenge was labeled a Confrontation Clause challenge, but at its core, the challenge went to the reliability of the testimony. *See Roberts*, 448 U.S. at 66. Subsequent cases—namely, *Crawford v. Washington*, 541 U.S. 36 (2004), and *Davis v. Washington*, 547 U.S. 813 (2006)—held that the Confrontation Clause was inapplicable to the kind of unreliable testimony that Mr. Legion had challenged, but they left the existing Due Process Clause framework in place. In accordance with those decisions, the Sixth Circuit held that Mr. Legion is not permitted to have a federal habeas court review the state court's resolution of the Confrontation Clause challenge, because Mr. Legion no longer has a Confrontation Clause right to be protected from unreliable nontestimonial hearsay. *Legion v. McKee*, 303 F. App'x 297 (6th Cir. 2008) (noting that this issue was "conclusively decided" in *Desai v. Booker*, 538 F.3d 424 (6th Cir. 2008)). But Mr. Legion does still have a due process challenge, *see Desai*, 538 F.3d at 431, and the underlying claim—that unreliable hearsay testimony was admitted against him—is still the same. To now penalize Mr. Legion because he did not "exercise extraordinary vision," *Engle*, 456 U.S. at 131, and anticipate that it would later be determined that reliability challenges should be

2:15-cv-11463-GAD-DRG    Doc # 1    Filed 04/22/15    Pg 20 of 36    Pg ID 20

labeled as Due Process Clause challenges rather than the Confrontation Clause challenges, would be fundamentally unfair. And to now require Mr. Legion to have raised a due process claim, which the state court would have considered duplicative of the Confrontation Clause claim—either "reject[ing] it out of hand," *Reed*, 468 U.S. at 15, or simply analyzing it under the same *Roberts* rubric—is likewise unfair.

In sum, the change in Confrontation Clause jurisprudence that *Crawford* and *Davis* produced is exactly the kind of "objective factor external to the defense" that constitutes cause to excuse Mr. Legion's procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). As Judge Battani recognized in *Desai v. Booker*, a case with an analogous fact pattern, "[t]his is the rare and exceptional case, occurring only after a major change in the law or in accepted practice, in which a defendant would have 'no reason' to raise in his direct appeal a claim that he presented in a collateral attack on his conviction." 882 F. Supp. 2d 926 (2012) (quoting *Desai*, 538 F.3d at 431), *overruled on other grounds*, 732 F.3d 628 (2013). Thus, this court should find cause to excuse Mr. Legion's default.

In addition to having cause for the default, Mr. Legion was prejudiced by the underlying constitutional violation. As discussed in more detail below, and as previously decided by this court, Mr. Legion's conviction was secured through the admission of shockingly unreliable hearsay. A jailhouse informant testified that

Mr. Legion's codefendant, Marvin Cotton, confessed to him while the informant and Mr. Cotton were in holding cells separated by a brick wall. Each cell contained thirty to forty inmates, and the informant never saw Mr. Cotton face-to-face. The informant also claimed that Cotton told him that a man named "Anthony" was also involved in the shooting.  Moreover, when asked to identify another "Anthony," who Cotton indicated was innocent, Frazier failed to identify Anthony Legion and instead identified Devonte Parks, Mr. Legion's other codefendant whose case was dismissed. The admission of this testimony violated Mr. Legion's right to due process, as discussed below. Moreover, it was highly prejudicial, as there was no other reliable evidence that suggested that Mr. Legion was involved in the murder.

Because Mr. Legion has demonstrated cause and prejudice, this court should excuse the state court default and hear Mr. Legion's due process claim.

## B. Where the state court failed to rule on the merits of the due process claim, this court should apply *de novo* review and grant the petition for writ of habeas corpus.

Typically, the standard of review set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), governs petitions for writ of habeas corpus.  The AEDPA standard provides that the writ may be granted if the state appeal:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

2:15-cv-11463-GAD-DRG   Doc # 1   Filed 04/22/15   Pg 22 of 36   Pg ID 22

(2)   resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254(d).

By its terms, this provision only applies to claims that were "adjudicated on

the merits in state court proceedings." *Id*.; *Clinkscale v. Carter*, 375 F.3d 430, 436

(6th Cir. 2004). The AEDPA standard does not apply, however, to issues the state

courts never addressed. *Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (applying de

novo review to that aspect of the petitioner's ineffective assistance of counsel

claim that was not decided by the state courts); *Maples v. Stegall,* 340 F.3d 433

(6th Cir. 2003) (declining to apply AEDPA standard to ineffectiveness claim not

addressed by state courts); *Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011) ("It is

well settled that we may review *de novo* an exhausted federal claim that was

adjudicated on the merits in state court.")).

This court issued an order granting Petitioner a conditional writ of habeas

corpus based on the Sixth Amendment right to confrontation. The unique nature of

the timing of this case in the midst of changing Confrontation Clause law meant

that the Sixth Circuit overruled the habeas grant. Mr. Legion subsequently

presented the issue of Cotton's confession to the jailhouse informant as a violation

of Due Process, and this court granted a stay so that he could return to the state

- 21 -

court to properly exhaust the claim. Shortly thereafter, Mr. Legion, through counsel, filed a motion for relief from judgment on the due process claim.

In denying this claim on procedural grounds, the trial court held that Petitioner did not "demonstrate[] good cause, as required by MCR 6.508(D)(3)(a), for failing to raise the issue in his prior appeal. . . . Defendant was represented by the State Appellate Defender's Office who could have raised this issue as a due process violation in his 2002 appeal." Appendix C at 7, 9. Following this conclusion, the court quoted the Court of Appeals opinion finding that Cotton's alleged statement did not violate the Confrontation Clause and remarked,

> [h]ence, as the Court of Appeals notes, even if the statement was erroneously admitted, the error would have been harmless because Cotton's statement did not directly identify Defendant and there was sufficient testimony from Lockhart to identify Defendant as one of the perpetrators. Thus, the Confrontation Clause issue has essentially already been decided and Defendant has not demonstrated good cause for failing to raise the due process argument in his prior appeal. [Appendix C at 9]

Even if the trial court's reference to the Court of Appeals conclusion that any Confrontation Clause error would have been harmless can be read as a harmless-error analysis of the present claim, this basis for denying relief is not an adjudication on the merits of the question of error. *See McCarley v. Kelly*, 759 F.3d 535, 543 (6th Cir. 2014) (*quoting Ayala v. Wong*, 730 F.3d 831 (9th Cir. 2013) ("We have found no published opinion in which, after a state court has

denied relief based on harmless error, a federal court has presumed that the state court adjudicated the merits of the question of error.")).

As the state court did not adjudicate the due process claim on the merits, this court should apply *de novo* review.  *Clinkscale*, 375 F.3d at 436.

## C.  The jailhouse informant's testimony of Cotton's unreliable confession violated Mr. Legion's constitutional due process rights.

The state's use of the co-defendant's inherently unreliable statement to a jailhouse informant rendered Mr. Legion's trial so fundamentally unfair that it deprived him of his due process rights to a fair trial under the Fifth and Fourteenth Amendments.  As a general matter, errors in evidentiary rulings by a state court are not cognizable in federal habeas review.  However, a federal court may grant relief where the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation.  *See, e.g. Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007).

The Due Process Clauses of the Fifth and Fourteenth Amendments guarantee that no person shall be deprived of "life, liberty, or property, without the due process of law."  U.S. Const Amends V, XIV.  Due process rights to a fair trial require the observation of fundamental fairness:

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally

- 23 -

> infected the trial; the acts complained of must be of such
> quality as necessarily prevents a fair trial.

*Lisenba v. People of State of California*, 314 U.S. 219, 236 (1941).

Reliability of evidence falls within fundamental fairness concerns necessitated by due process. *See White v. Illinois*, 502 U.S. 346, 363-364 (1992) (Thomas, J., concurring) ("Reliability is more properly a due process concern. There is no reason to strain the text of the Confrontation Clause to provide criminal defendants with a protection due process already provides them"); *United States v. Shoupe*, 548 F.2d 636, 643-644 (6th Cir. 1977) (admission of unreliable hearsay required reversal under due process clause because it extended beyond "permissible limits of fairness"); *United States v. Agular*, 975 F.2d 45, 47 (2nd Cir. 1992) ("We may assume that facially unreliable hearsay would raise a due process issue...").

The Supreme Court has long recognized that constitutional due process rights are implicated where a defendant's fair trial is prejudiced by an unreliable statement, not subject to cross-examination: "The right of the accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses … have long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). *See also Bruton v. United States*, 391 U.S. 123, 131 (1968), noting, "An important element of a fair trial is that the jury consider only

*relevant and competent evidence* hearing on the issue of guilt or innocence"
(emphasis added).

In *Chambers*, the Court addressed whether the trial was conducted in accord
to principles of due process under the Fourteenth Amendment.  Chambers was
tried and convicted of murdering a policeman.  *Chambers,* 410 U.S. at 284.  After
Chambers was arrested for the murder, another man, Gable McDonald, made a
written confession, but later repudiated the confession.  McDonald also confessed
to three people during conversations.  *Id*. at 287-289.  At trial, Chambers called
McDonald as a witness after the State failed to do so.  *Id*. at 291.  Chambers
requested to cross-examine McDonald as an adverse witness; however he was not
allowed to do so under Mississippi's 'party witness' or 'voucher' rule.  *Id*. at 291,
294.  Chambers also attempted to introduce the testimony of three witnesses to
whom McDonald had confessed.  *Id*. at 292.  However, the witnesses' testimony
was excluded on hearsay grounds.  *Id*. 292-293.  Thus, Chambers asserted that he
was denied a fair trial in violation of due process.  *Id.* at 285.

In holding that Chambers' was denied "a trial in accord with traditional and
fundamental standards of due process," the Supreme Court reasoned that the
"denial or significant diminution" of the right to confront and cross-examine
witnesses, "calls into question the ultimate 'integrity of the fact finding process'
and requires that the competing interest be closely examined."  *Id*. at 295, 302

(quoting *Berger v. California*, 393 U.S. 314, 315 (1969)).  Though in *Chambers* "the Court was looking at the state trial court's improper *exclusion* of certain evidence that would potentially have assisted the defendant[,] . . . its tenets are equally applicable to situations involving a state trial court's improper *admission* of certain evidence injurious to the defendant.  *Ege v. Yukins*, 485 F.3d 364 (6th Cir. 2007) (emphasis in original).

Like Chambers, Mr. Legion could not properly challenge the evidence presented by the prosecution at trial.  A jailhouse informant nicknamed "Old School" presented the statement of Mr. Cotton that linked Mr. Legion to the murder.  Like Chambers, Mr. Legion was "not allowed to test the witness' recollection… or to 'sift' his conscience as that the jury might judge for itself whether [McDonald's] testimony was worthy of belief."  *Id.* at 295 (quoting *Mattox v. United States*, 156 U.S. 237, 242-243(1895)).

This connection between cross-examination of witnesses and due process has been recognized by the Supreme Court in a variety of procedural contexts.  *See Specht v. Patterson*, 386 U.S. 605, 610 (1967) ("Due process, in other words, requires that he be present with counsel, have an opportunity to be heard, *be confronted with witnesses against him, have the right to cross-examine*, and to offer evidence of his own.") (emphasis added); *Willner v. Committee on Character and Fitness*, 373 U.S. 96, 103 (1963) ("We have emphasized in recent years that

procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood."); *Morrisey v. Brewer*, 408 U.S. 471, 489 (1972) (finding right to confrontation and cross-examination among minimum requirements for due process at parole revocation hearing, but allowing hearing officer to limit for good cause). Changing Confrontation Clause law means that Frazier's unreliable, but non-testimonial, statement no longer implicates the Clause. Nevertheless, United States Supreme Court precedent mandates that unreliable, unchallenged statements should still be analyzed to see whether they are so fundamentally unfair that they violate constitutional due process rights. In Mr. Legion's case, they do.

**D.  As previously found by this court, the unreliable testimony of the jailhouse informant resulted in Mr. Legion's conviction.**

The state's case rested entirely on the "uncertain eyewitness identification testimony of Kenneth Lockhart, the decedent's housemate, and Mr. Legion's co-defendant's statement to the jailhouse informant allegedly implicating Mr. Legion.

The prosecution never introduced physical evidence of Mr. Legion's guilt. Police who arrived at the scene found that Mr. Lockhart's account of events lacked credibility, and his assertions could not be substantiated by physical evidence. Opinion and Order, July 10, 2007, at 7. Further, Mr. Lockhart identified Mr. Legion from a single photo array with only ninety percent certainty, while he was

one hundred percent certain of his identification of Mr. Legion's co-defendant, Mr. Cotton. *Id* at 8.

Ellis Frazier testified that Marvin Cotton confessed to him in the Wayne County jail. *Id*. at 10. According to Frazier, the two were in adjacent holding cells, separated by a brick wall with each cell containing about thirty to forty inmates. *Id*. Frazier also testified that there was no eye-to-eye contact; it was "just a voice thing." *Id*. According to Frazier, Cotton allegedly confessed to him and said that a man named "Anthony" accompanied him during the shooting. *Id* at 11. Frazier also testified that there was a third participant in the holding cell conversation, a man sitting next to him in his cell who he believed was also named "Anthony." The "Anthony" that was present discussed the crime with Cotton, and Cotton referred to "Anthony" as being innocent. *Id*. When asked to identify the "Anthony" that participated in the conversation, Frazier identified Devonte Parks, whose case was dismissed. *Id*. at 5, 12.

The United States Supreme Court has recognized that statements made by alleged accomplices are inherently unreliable, "the evidence of such a witness ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed upon by the jury under the same rules governing other and apparently credible witnesses." *Crawford v. United States*, 212 U.S. 183 (1909). Here, not only are the motivations of the alleged accomplice suspect, the

- 28 -

only witness who testified that this statement was even made was himself highly unreliable. Frazier's confusing testimony makes the identity of "Anthony" unclear, especially given the circumstances of the alleged "jailhouse confession." *Id*. at 12. Thus, this court properly found that the co-defendant's purported statement to a jailhouse informant was entirely unreliable. *Id*. at 23, 25.

Absent this connection between Mr. Legion and Mr. Cotton established by the jailhouse informant, the case against Mr. Legion unravels. All credible physical and identification evidence points to the guilt of Mr. Cotton and two unidentified accomplices. Mr. Lockhart and Lovely Kimble, another witness, identify Cotton at the scene. Mr. Lockhart and a man named Andre Paul identify Cotton as a frequent visitor to the deceased's house. Ms. Kimble and Officer Santonion Adams identify Mr. Cotton's mother's car at the scene. Mr. Lockhart never wavers in his identification of Mr. Cotton as one of the three perpetrators and visitors from the day before the shooting.

In contrast, no witnesses tie Mr. Legion to Mr. Cotton, the deceased, or any vehicles near the house. Ms. Kimble never identified him and Mr. Paul never saw him with the deceased. Only Lockhart identifies Mr. Legion at the scene, and initially with a 90% certainty. Police officers and investigators find Lockhart's account incredible and contradicted by their observations. The Sergeant at the scene testified that Lockhart had been drinking. Other eyewitnesses offer

inconsistent descriptions of the perpetrators' facial hair and head wear to that of

Mr. Lockhart.  Mr. Lockhart admitted to poor lighting conditions.

As this court concluded:

> [T]he only evidence inculpating Petitioner was Cotton's
> jailhouse statement to Frazier. Petitioner and Cotton were
> co-defendants, and with the admission of Cotton's alleged
> confession to Frazier, Petitioner was Cotton's accomplice
> to the shooting. Frazier's testimony of Cotton's alleged
> confession corroborates the already substantial evidence
> offered against Cotton, and provided the only certain link
> to Petitioner and the crime. Without the alleged
> confession, Petitioner was implicated only by unreliable
> and inconsistent identification testimony from a witness
> that even the police found incredible.

*Id*. at 30-31.

Ellis Frazier's testimony was highly prejudicial.  There was no other

credible evidence against Mr. Legion.  Thus, it was a "crucial, critical[,] highly

significant factor" that fundamentally undermined Mr. Legion's right to a fair

trial.  *Ege*, 485 F.3d at 375 (*quoting Brown v. O'Dea*, 227 F.3d 642, 645 (6th Cir.

2000)).

**E.    Habeas relief is also required based on the plain language of 28 U.S.C. §
      2254.**

Per *Desai* there is an alternate ground that entitles Mr. Legion to habeas

relief.  In *Desai*, 538 F.3d 424, the Sixth Circuit held that 28 U.S.C. § 2254(d) and

§ 2254(a), by their terms, impose two distinct hurdles for a habeas petitioner. *See*

*also Doan v. Carter*, 548 F.3d 449, 457 (6th Cir. 2008).

To clear the § 2254(d) hurdle, the petitioner must show that the state court, in adjudicating the petitioner's claim, " 'unreasonabl[y] appli[ed]' Supreme Court precedent, unreasonably found facts in deciding the case, or contradicted a relevant Supreme Court decision." *Id.* at 428 (quoting 28 U.S.C. § 2254(d)). In order to answer that question, the habeas court should "measure [the] state-court decision[] 'against [the Supreme] Court's precedents *as of the time the state court renders its decision.*' " *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011)) (internal quotation marks omitted).

To clear the § 2254(a) hurdle, by contrast, the petitioner must show that he or she is "*currently . . .* being held in violation of an existing constitutional right." *Desai*, 538 F.3d at 428 (emphasis added). By its plain language, § 2254(a) does not direct the habeas court to give deference to the state court's decision, measure the state court's decision against Supreme Court precedents at the time of the decision, or even consider the state court's decision at all: Section 2254(a) makes no mention of the Supreme Court, "clearly established federal law," or its "unreasonable application." Rather, by its plain language, § 2254(a) simply requires the habeas court to ask whether petitioner's constitutional rights were violated at trial. And, as the *Desai* court explained, the answer to this question depends on the current understanding of the Constitution. *See id.* at 428. Since-overruled or since-revised constitutional principles are "'considerations that, as a

matter of law, ought not inform the inquiry.'" *Lafler v. Cooper*, 132 S Ct. 1376, 1387 (2012) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 373 (1993) (O'Connor, J., concurring)). In sum, the § 2254(a) inquiry requires a de novo review of the claim, with reference to current Supreme Court and lower court precedents.

As already found by this court, the state court unreasonably applied clearly established federal law—namely, the then-controlling *Ohio v. Roberts*, 448 U.S. 56 (1980), test—when it found that the Confrontation Clause did not bar the admission of the jailhouse informant's unreliable hearsay testimony. *See Legion v. McKee*, No. 05-CV-40181, 2007 WL 2004918 (E.D. Mich. July 10, 2007). Thus, Mr. Legion surmounts the § 2254(d) hurdle. And because the admission of that unreliable hearsay testimony also violated due process, Mr. Legion is "*currently . . . being held in violation of an existing constitutional right*." *Desai*, 538 F.3d at 428 (emphasis added). Thus, Mr. Legion surmounts the § 2254(a) hurdle.

Mr. Legion's unreliable-hearsay claim satisfies both § 2254(d) and § 2254(a): The admission of Cotton's unreliable confession through the testimony of the jailhouse informant (1) constitutes an unreasonable application of *Roberts* by the state courts, and (2) means that Mr. Legion is currently in custody in violation of his right to due process. Therefore, Mr. Legion is entitled to relief.

**II.     MR. LEGION IS STILL ENTITLED TO EITHER HABEAS RELIEF OR AN EVIDENTIARY HEARING ON THE OUTSTANDING ISSUE OF INEFFECTIVE ASSISTANCE OF COUNSEL.**

Mr. Legion requests that given the unique circumstances of this case, whereby changing Confrontation Clause law required reversal of the original habeas grant, this court now review this second issue, and either grant habeas relief or order an evidentiary hearing involving the testimony of Mr. Parks. (Petition for writ of habeas corpus, Issue II).

## <u>SUMMARY AND RELIEF</u>

**WHEREFORE**, for the foregoing reasons, Petitioner asks that this

Honorable Court:

(1)     Grant habeas relief based on a violation of due process; or

(2)     grant habeas relief based on ineffective assistance of counsel, or order

an evidentiary hearing for further development of the record.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

<u>s/Katherine Marcuz</u>
**KATHERINE MARCUZ**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833
kmarcuz@sado.org
P76625

**ERIC YFF**
Student Attorney
University of Michigan Law School

Dated:        April 22, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  John Pallas, Attorney for State of Michigan.


s/Katherine Marcuz_____
**KATHERINE MARCUZ**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan  48226
(313) 256-9833
kmarcuz@sado.org
P76625